Peter Talbot, Atty. Lic. No. PA 13974

554 Rosemary Circle
Media, PA 19063
(610) 566-3315

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Talbott Barnard, 817 Indian Trail Boulevard, Traverse City, Mich. 49686   : **CIVIL**
Donald B. & Susan Biggerstaff, 104 Ridge Drive, Morganton, N.C. 28655: **CASE NO. :**
David Boon, 11486 Old Forge Rd., Waynesboro, PA 17268   :   **10-1304**
Greg & Deb Boser, 92 Chudy St., Three Rivers, Mass. 01080
Col. Thomas Bovet, 3/F Flat E. Golden Jubilee House, 397 Lockhart Rd.
    Wanchai, Hong Kong   :
Mark Hendrych, P.O. Box 75, Bethel Park, PA 15102   :
Zhengxu He & Ying Fang, 5220 Belsera Court, Reno, Nevada 89519   : **Jury Trial**
Bin Li, 925 Washington St., Glenview, Ill. 60025
Thomas E. Martin, 3072 West Glenn Point Lane, Tucson, Ariz. 85745-1002   **Demanded**
Middlebar Monastery, Non-Profit, 2503 Del Rio Drive, Stockton, CA 95204
Jersy Nietubyc, 1502 15th Court, Jupiter, Fla. 33477   :
Katherine Perino 2420 Longhorn Trail, Tucson, Ariz. 85745   :
Brian D. Spencer, 1026 S. Maple Street, Traverse City, Mich. 49684   :
Stephen S. Spencer, 555 Quail Ridge Drive, Traverse City, Mich. 49686   :
Charles J. Turk, 519 S. Main St., Sycamore, Illinois, 60178
- known, collectively as "The Spencer Committee"   :

### Plaintiffs

#### vs.

Verizon Communications, Inc.   :
140 West Street, New York, N.Y. 10007
Registered Agent: CT Corporation System, 116 Pine St., Suite 320
Harrisburg, PA 17101
      and
J.P. Morgan Chase Bank, N.A., Individually and as Agent
270 Park Avenue, New York, N.Y. 10017-2070   :
Registered Agent: CT Corporation System, 116 Pine St., Suite 320
Harrisburg, PA 17101

### Defendants

## SECOND AMENDED COMPLAINT

**Table of Contents**

Subject                                                                                          Page

I. General Background
   1. The History ................................................................................4

II. The Allegations ...............................................................................6

   2. The Causes of Action ..................................................................... 6

   3. Allegations Entitling Summary Judgment ................................................ 6

   4. Specific Allegations .................................................................... 9

      (i) Misrepresentation of Solvency .......................................................9
      (ii) Federal Tax Avoidance ............................................................10
      (iii) Insider Trading Fraud ...........................................................12
      (iv) Intentional Bankruptcy ...........................................................12
      (v) Fraudulent Opportunity ...........................................................13
      (vi) Fraudulent Business Practice ....................................................14
      (vii) Violation of 18 U.S.C. 157(1) ..................................................15
      (viii) Conversion of shares ..........................................................16

III. Jurisdiction and Venue

   5. Federal Question Claims ...............................................................17

   6. State level claims ...................................................................17

   9. Venue ................................................................................18

IV. The Parties

   10. The Plaintiffs ...................................................................... 18

   11. Defendant Verizon Communications, Inc ...............................................23

   12. Defendant J.P. Morgan Chase Bank, N.A., individually and as Agent .................23

   COUNT I      Federal Telecommunication Act Claims .................................... 24

   COUNT II     Federal Securities Exchange Act Rule 10b-5 Claims ...........................27

   COUNT III    Federal Securities Exchange Act Rule 10b-5-1 Claims ........................30

   COUNT IV     Common Law Fraud ...............................................................32

   COUNT V      Common Law Conversion ..........................................................35

   COUNT VI     Constitutional Infringement ..................................................36

   COUNT VII    Shareholder Right of Action Established by Decree in Bankruptcy ............39

1

## (Table of Contents - Continued)

RELIEF REQUESTED ........................................................................... 41

  Findings Requested

    A. Duty of Recipient of Pass-through Loans ...........................................41

    B. Duties of Lenders Making Pass-through Loans .................................... 42

    C. Law of the case .................................................................... 43

  Awards Requested ........................................................................ 44

  Verification ............................................................................... 45

## Table of Citations

**Cases**

*Cargill v. Hardin* 452 F.2'd 1154 (C.A.8'th 1971) ............................................. 26
    Commodity trading license of major company (Cargill) suspended for scheme
    to manipulate the market.

*F.C.C. v. Woko* 329 U.S. 223 (1946) ..............................................................26
    Supreme Court affirmed radio station license revocation for securities fraud, in that
    Company had failed to state in its application that 24% of the stock had been given
    as a bribe to an officer of CBS to obtain CBS financing of station construction
    costs.

*In re National Forge Co.* 344B.R. 340, 347 (W.D. PA 2006) .........25,27,29,31,32,34,39

    Bank loan to corporation then used to redeem stock, held a single collapsed transaction.

*KWK Radio, Inc. v. FCC* 337 F.2'd 540 (D.C. App. 1964) ....................................26
    FCC radio license suspended because or broadcast of fraudulent game show

*McAsset Recovery LLC v.The Southern Co.* N. District of Gerogia,No.1:06-cv-417(2009) ....
                                                      ..27,31,35,39,43

    The Southern Company's spin of subsidiary, Mirant, Corporation.
    resulting, a year and a half later in the insolvency and Chapter 11 Bankruptcy of
    Mirant - held a jury issue respecting certain cash transfers made by Mirant to Southern
    that were integrated with the spin (a $1 Billion cash transfer and $500 Million in
    supposed "dividends"). Several Pennsylvania cases cited for the proposition that
    the dividend is "integrated" with the spin, as a "single collapsed fraudulent transaction."
    *In re Nat'l Forge Co.* 344 B.R 340,. 347 (W.D. PA 2006); *U.S. v. Tabor Court Realty* 803
    F.2'd 1288 (3'd Cir. 1986); *Voest-Alpine Trading USA v. Vantage Steel* 919 F.2'd 206
    (3'd Cir. 1990).

*Moody v. Security Pacific* 971 F.2'd 1056, 1065 (3'd Cir.1992). ...........................13,34
    "We think it settled, as a general matter at least, that the fraudulent conveyance
    provisions of the U.F.C.A. extends to leveraged buy outs" (citing case law in PA,

2

Illinois, Mass. and Ohio).

*Susquehanna Valley Alliance v. Three Mile Island* 619 F.2'd 231 (C.A.3'd 1980)    ...........39
     Held that a *"Bivens"* right of action [for violation of 5th Amendment rights] exists in the 3'd Circuit.

     "Certainly a complaint alleging a cause of action for private relief implied from provisions of the United States Constitution states a claim within the subject matter jurisdiction of the district court, *Bivens v. Six Unknown Named Agents of the Fed.Bur. of Narcotics* 403 U.S. 388....(1971)"    (p. 244)

*U.S. v. Tabor Court Realty* 803 F.2'd 1288) (3'd Cir.1986)       .................27,31,35,39

**U.S. Constitution  (5th Amendment)** ....................................................................................17,36

**Statutes**

| | |
|---|---|
| 15 U.S.C 78aa | ............................................................................,18 |
| 15 U.S.C. 78j | ..........................................................................,6,17,27,30 |
| 18 U.S.C. 157(1) | ..................................................................9,13,15,16 |
| 26 U.S.C. 355(e) | .............................................................11,12,30,38 |
| 47 U.S.C. 206 | ............................................................. 6,17,24,26,44 |
| 47 U.S.C. 214 | ............................................................. 17, 37 |
| 28 U.S.C. 1331 | ...........................................................................17 |
| 28 U.S.C. 1332 | ...........................................................................18 |
| 28 U.S.C. 1391(b) | .........................................................................18 |

**Regulations**

| | |
|---|---|
| 17 C.F.R. 240.10b-5 | ..............................................................17,27,30 |
| 17 C.F.R. 240.10b-5-1 | ..............................................................12,17,30 |
| **Rules** - F.R.C.P. 60(b)(3) | ............................................................... 7,8,16 |
| **Treatises** | |
| Restatement of Restitutions §570 | .........................................................................32 |
| iv Blackstone 156 | ...............................................................13, 34 |

## COMPLAINT

**I.   General Background**

1. The History. This action involves the history of the ownership of the profitable telephone directory (white and yellow pages) and advertising business formerly controlled and conducted by the Bell Operating Companies and variously named: GTE, Verizon Information Services, Inc., Spinco, Idearc, Inc. and now (following bankruptcy) SuperMedia - and the employment of that constantly changing format (which was never an independent entity) for a large and one-time purpose other than its chartered business purpose - a massive, Enron-style debt offloading spin transaction that could escape federal taxation (in fact, just one of three such transactions accomplished by Verizon Communications, Inc. ("Verizon"), followed by quick bankruptcy - Hawaiian Telecommunications, Inc., Idearc, Inc. and Fairpoint Communications, Inc.

This subject Idearc, Inc. ("Idearc") "spin" was consummated in 2006, (after a series of failed attempts to sell the subsidiary to potential bidders). It takes the form of an agreement with creditor banks (then holding $7 Billion of Verizon debt) to: (i) exchange that debt for new subsidiary debt, (ii) followed by a spin of the subsidiary, then (iii) should the subsidiary fail, as expected that it would (a fact which has been admitted on the record), the banks might take it over, thus

4

consummating the reality of a sale - but without the tax - a savings, by itself, in the billions! It is what they did, but with the addition, on the spin-off date, of another $2 Billion in add-on purchase price, by a "pass-through" loan, where Idearc (still subservient) signs for the money, keeping none of it, but paying all over to Verizon, bringing its own total debt load (for which, in major part, it received no consideration) to the expectedly unsustainable final amount of $9 Billion!

In the whole history, Idearc, as an independent company, never signed an I.O.U. to any bank, never received the monies from the subject bank loans, and never agreed to the level of consideration that ought to have been paid. Yet, and without exploring any of these matters, it has been adjudged bankrupt!

This is now an action by the above listed shareholders of Idearc, Inc. ("Idearc", former subsidiary of Verizon Communications, Inc.) to recover for losses suffered by reason of Idearc's Chapter 11 Petition in Bankruptcy (in the U.S. Bankruptcy Court for the Northern District of Texas, No. 09-31828) and resulting cancellation of their share ownerships. They complain that Idearc, as Agent of Verizon, both participated in the fraudulent debt transfers, and now (just two years later), in bankruptcy, has caused a cancellation of the common, though well knowing the Bankruptcy to be false, since no monies have been lost. They are being "hidden" - in the improved balance sheet condition of the still related Verizon - the telephone carrier of the directory published by Idearc under long-

5

term (30 year) agreement.  Verizon is the actual borrower of the monies for which Idearc is being unjustly charged - the essential fact being undeniable and entitling Summary Judgment for the Plaintiffs.

## II. The Allegations

2. <u>Causes of action</u>. Plaintiffs allege: (A) against Verizon Communications, Inc. ("Verizon") a Count for statutory liability for misuse of federal franchise under 47 U.S.C. § 206 (The Telecommunications Act of 1934), (B) Against J.P. Morgan Chase Bank, N.A. ("J.P. Morgan") an action for common law conversion, and (C) against Verizon AND against J.P. Morgan all the following:  Securities Exchange Act §10b "fraud on the market" and "insider trading" violations, common law fraud, and constitutional infringement.

3. <u>Allegations Entitling Summary Judgment</u>:

This is an action for security losses sustained in a Bankruptcy Proceeding (*In re Idearc*, U.S. Bankruptcy Court, Northern District of Texas (No. 09-31828) in which the Court itself acknowledged the existence of a cause of action for potential fraud in the causation of the indebtedness upon which the Bankruptcy was based, and authorized the creation of a "Litigation Trust" to pursue claims for reimbursement on that account.

In addition to this *res adjudicata* decision of the Bankruptcy Court, having Jurisdiction of the matter (that a cause of action exists), there are the following

circumstances entitling Summary Judgment for the Plaintiffs, namely, that:

(i). The bankruptcy condition did not arise from the casual business of the debtor, but was intentionally created by the same persons who benefited by the bankruptcy (the Defendants herein).

(ii). The whole of the Idearc indebtedness was acquired at a point in time when it was still a controlled subsidiary of the parent, and lacked volition: As an independent entity, it never signed an I.O.U., and creditor banks in pursuing Idearc, well knew that they were charging a company that did not have and never had possession of the monies causing bankruptcy, while exonerating the person (Verizon) who has, and still continues, to enjoy, the actual possession.

(iii). By admission, which is on the record, the bankruptcy (recapitalization or insolvency) was an intended short term consequence of the spin transaction,

(iv). In practice, bankruptcy has been the actual consequence of not one, but three, related spin transactions by defendant Verizon indicating a pattern of behavior, requiring a presumption of *scienter*.

(v). The resulting Idearc bankruptcy proceeding  FIRST admits to the existence of a potential claim for fraud in the spin transaction - by assigning rights of recovery for that (as an asset of the Estate) to a "Litigation Trust",  with allocated shares awarded to the creditors (not to the equity), and THEN rules this to be irrelevant in both (A) confirmation of the bankruptcy plan and (B) a post trial F.R.C.P. Rule 60(b)(3)  proceeding - the rule specifically provided to protect from the infection of fraud - the Court seeing no connection between the presence of a potential fraud in the debt creation, and the issue of "Bad Faith" in the filing itself; and therefore granting no trial of the issue prior to cancellation of the ownerships.

(vi). The bankruptcy condition, as alleged in the Chapter 11 proceeding, was  facially preposterous, in that (by market price, by payment of initial dividend,

7

and by judicial admissions made by counsel for J.P. Morgan within the bankruptcy proceeding) Idearc was justly spun to sell at an equity value of $5 Billion, yet alleged, in bankruptcy, to be nearly worthless ( at $260 Million entire value) - but: (A) a short two years only have intervened, (B) the company never lost money in any year, and (C) it is just relieved of a whole $6 Billion of its former debt!

It is a valuation claim so irrational that expert testimony in support of it ought not to be allowed.

(vii). Having taken, on such a basis, (A) 85% of the equity ownership, (B) a continuing $3 Billion of their former debt, (C) $750 Million cash, (D) a nearly double interest rate, and (E) 67.5% of the cash flow going forward, the creditor banks (J.P. Morgan, as Agent) then, in malicious fashion, offered the stock for public trading, utilizing a full 30% share of the company (keeping for themselves the controlling 55%) but at such low price level as to make for themselves at best, a maximum of $80 Million - a sum, that should have been given to compensate the common. The figures are facially inequitable, and such that ought to shock the conscience of the Court.

(viii). And they did this public distribution at a point in time which was less than 10 days from the date of the Confirmation Order, while there was an appeal of the Order pending, as well as a pending hearing on a Rule 60(b)(3) Motion for Relief from Judgment, thereby, by private action, removing these - both the motion and the appeal - fully and finally from the judicial cognizance.


4. Specific Allegations.

In addition to the foregoing circumstances entitling Summary Judgment as a matter of law on the admitted and undeniable facts, the following allegations will be provable: (i) Misrepresentation of Solvency, (ii) federal tax avoidance scheme,

(iii) insider trading fraud, (iv) common law crime of intentional bankruptcy, (v) fraudulent opportunity (equivalent of equitable subordination), (vi) fraudulent business practice, (vii) violation of the 18 U.S.C.§157(1) prohibition against use of Chapter 11 as a scheme to defraud, and (viii) the common law intentional tort of *de bonis asportatis* (conversion), more specifically, as follows:

(i). Misrepresentation of Solvency:   This is a case of a $6 Billion bank debt, enforced against a company that never borrowed, and never had such sum of money, nor as an independent company ever signed an I.O.U. to any bank on account of it. Instead,

Verizon Communications, Inc. (1) borrowed the money, (2) transferred the repayment obligation, (3) with bank complicity, (4) over to the books of its controlled subsidiary (Idearc, Inc.) thereby acquiring a fiduciary duty toward the subsidiary, (5) well knowing that Idearc had no ability to repay (except gradually over time), (6) then, utilizing its own name recognition as a "telephone stock", (7) successfully spun the already bankrupted subsidiary into public hands (causing change of ownership of the debt as well as of the company), (8) for trading on the New York Stock Exchange (11/16/06), (9) thereby also gaining tax exemption for the off-loaded debt, and (10) while occupying the position as an effective seller for value (the ridding of debt), with duty to speak, instead, concealed from the investing public what had always been the spin's intent - to see and permit a near term recapitalization (take-back of the public ownerships), while (11) creating the appearance of value by an initial generous dividend, not actually sustainable and (12) thereby misrepresenting the solvency of the company.

9

Intent to defraud (*scienter*) existed - by admission [contained in the fine print (p. 48) of Verizon's 2007 Annual Statement, published in 2008], that it was a purpose of the spin transaction that the Idearc balance sheet might be subject to a recapitalization....which when read together with a "Tax Sharing Agreement" (among the spin documents) meant a life span of just two years.

Had this been advertised (as Idearc's 30 year publishing monopoly was advertised), it would have rendered the public distribution and debt reduction impossible of execution, as no one would have bought that stock under such condition.

This was: (1) an intentional concealment by Verizon (with purpose to do harm) of (2) vital and material information, (3) the concealment intended to be relied upon to induce creation of an artificially inflated public market for the stock, in an initial registration and sale of securities of Idearc, from which (4) widespread, and catastrophic harm, as to the Plaintiffs herein, was foreseeable, (5) which harm did in fact occur to the Plaintiffs, by their reliance on the market and investment in shares of Idearc, Inc. (6) prior to knowledge of the material facts learned only upon the Idearc Chapter 11 Petition filed, March 31, 2009.

(ii). Federal tax avoidance scheme.

A. Tax avoidance is the motivation, and the explanation of the Spin Transaction. The advantage to Verizon was a gratis debt off-loading into public hands ($9 Billion in total amount), and a tax avoidance under the IRS rules that allow escape from capital gain taxation, on the ($9 Billion) gain - when transfer of ownership is delayed for a period of just two years from the spin-off date. [26 U.S.C.§ 355(e)].

B. Verizon has admitted (in its 2007 Annual Statement) to its initial purpose to permit recapitalization. But hidden in the fine print of the spin documents is a

10

"Tax Sharing Agreement" that prohibits recapitalization prior to the end of the two year "safe harbor" as provided in IRC §355(e) - implying permission for the transaction (as actually occurred) <u>after</u> the brief waiting period.

C.   Idearc did not delay; it announced intent to recapitalize and began "substantial negotiations toward that end as early as October 2008 - possibly violating IRS "Anti- Morris Trust" regulations.

D.   In doing so, it became exposed to liability under the said "Tax Sharing Agreement", and being thus exposed, and fully understanding that exposure, it is one of the liabilities from which (in an admission against interest) it seeks discharge in Bankruptcy.

E.   Had the purposes of the spin transaction as above described been plainly disclosed, prior to the spin, no public market could or would have been created for this stock. The transaction was both a tax avoidance scheme and a fraud upon the market JOINTLY executed by Verizon and J.P. Morgan, and with complicity of Idearc, in breach of its fiduciary duty to security holders.

This was: (1) an <u>intentional</u> concealment by Verizon (with purpose to do harm) of (2) vital and material information, (3) the concealment intended to be relied upon to induce creation of an artificially inflated public market for the stock, in an initial registration and sale of the securities of Idearc, from which (4) widespread, and catastrophic harm, as to the Plaintiffs herein, was foreseeable, and (5) which harm did in fact occur to the Plaintiffs, by their reliance on the market and investment in  shares of Idearc, Inc. (6) prior to knowledge of material facts learned only upon the Idearc Chapter 11 Petition filed, March 31, 2009.

11

(iii). <u>Insider Trading Fraud</u>.

Because the spin transaction, followed by a short term [within two year] transfer of ownership [of the spun company to the banks], may be treated by the IRS as a "sale" <u>for tax purposes</u> [26 U.S.C. §355(e)], <u>it is also a "sale" for fraud purposes</u>, and regardless of the precise timing, so long as transfer of ownership was the intended outcome, as now admitted by Verizon to its own shareholders in its 2007 Annual Statement.

Because the transaction, as described, amounted to a <u>sale</u>, Verizon and the participating banks (J.P. Morgan, individually and as Agent) were guilty of trading in the stock of Idearc with knowledge (of intent to recapitalize), not shared with purchasers of the shares of Idearc, Inc. at the time of the spin transaction, nor at any later time, but admitted to its own (Verizon) stockholders in the fine print of a 2007 Annual Statement (p. 48), all in violation of 17 C.F.R. §240.10b-5-1(a).

This was: (1) an <u>intentional</u> concealment by Verizon (with purpose to do harm) of (2) vital and material information, (3) the concealment intended to be relied upon to induce creation of an artificially inflated public market for the stock, in an initial registration and sale of the securities of Idearc, from which (4) widespread, and catastrophic harm, as to the Plaintiffs herein, was foreseeable, and (5) which harm did in fact occur to the Plaintiffs, by their reliance on the market and investment in shares of Idearc, Inc. (6) prior to knowledge of material facts learned only upon the Idearc Chapter 11 Petition filed, March 31, 2009

(iv). <u>Intentional Bankruptcy</u>:

Defendants Verizon and J. P. Morgan unlawfully conspired to: <u>FIRST</u> bankrupt the balance sheet of Idearc, Inc. with obligations on account of monies paid beneficially to Verizon and not to Idearc, <u>SECOND</u>, permit enforcement of a near term (2 year) repayment obligation upon the full amount thereof, not against Verizon, and not even against Idearc, but against the newly created public

12

ownerships of the capital structure of Idearc, as for the second step in a single, collapsed fraudulent spin-bankruptcy transaction, THIRD, thereby to achieve the reality of a delayed "sale" of Idearc to J.P. Morgan, paid for by the general public!

The Idearc, Inc. condition of insolvency was not a normal bankruptcy, in that it did not arise out of the casual business of the Debtor (as in the high employment costs of the airlines, the decline of rail travel in the case of Penn Central, or the foreign competition that afflicted the auto business). It was deliberately caused, at a single point in time, and for clear and admitted tax avoidance purposes. Such a circumstance would have been a crime at common law - compared to falsification of the coin (iv Blackstone 156).

It is still a crime under Chapter 11 [18 U.S.C. 157(1) -[use of Chapter 11 as a scheme to defraud] - and it is the ground for invalidation of Chapter 11 Petitions in many "leveraged buy-out" cases: *Moody v. Security Pacific* 971 F.2'd 1056, 1065 (3'd Cir. 1992).

### (v). Fraudulent Opportunity (Equivalent of Equitable Subordination )

(1) It was the Defendant, J.P. Morgan that, by agreement with Verizon (under a so-called "Exchange Agreement" (dated 11/13/06), first bankrupted the balance sheet of Idearc, to the tune of approximately $4 Billion prior to the public distribution of its shares, and then added $2 Billion more to that, by pass-through loans, effective on the date of the spin, thereby effectively "buying" the company, then and there, should a bankruptcy occur.

(2) And it is the same person, J.P. Morgan, that 2½ years from the spin date, takes so much of the ownership, that what is left of the original $5 Billion market capitalization is reduced to a claimed Bankruptcy value of no more than $260

Million (after debt relief) - a differential that cannot be and has never been explained.

(3)  It is J. P. Morgan, who was both causal agent of the bankruptcy, and claimant to the ownership in the pre-planned bankruptcy proceeding.

(4)  The claims of J.P Morgan, individually and as Agent, in the bankruptcy proceeding constituted a fraudulent exploitation and maximization of a self-created opportunity, and for which it ought to be held accountable.

This was: (1) an <u>intentional</u> concealment by Verizon and J.P. Morgan (with purpose to do harm) of (2) vital and material information, (3) the concealment intended to be relied upon to induce creation of an artificially inflated public market for the stock, and from which (4) widespread, and catastrophic harm, as to the Plaintiffs herein, was foreseeable, and (5) which harm did in fact occur to the Plaintiffs, by their reliance on the market and investment in shares of Idearc, Inc. (6) prior to knowledge of material facts learned only upon the Idearc Chapter 11 Petition filed, March 31, 2009.

(vi). <u>Fraudulent Business Practice</u>:

The instance of a fraudulent spin transaction, in the case of Idearc, is but one of a series of Verizon-authored Chapter 11 bankruptcies following debt off-loading spins that included <u>Hawaiian Telecommunications, Inc.</u> (U.S. Bankruptcy Court, District of Hawaii, No. 08-02005), <u>Idearc, Inc.</u> (U.S. Bankruptcy Court, N. District of Texas, 09-31828), and <u>Fairpoint Communications, Inc.</u> (U.S. District Court, So. Dist. of N.Y. 09-16335), all a result of Verizon's curriculum of debt off-loading

made necessary by the great sums paid for federal licensing, then building, of the vast new wireless and fiber optic networks.

It is an historical fact that Verizon could not pay for this, itself, and so distributed the cost, by fraudulent means, to unwary investors in its spun subsidiaries.

That Verizon had in place such a regular strategy and plan - of debt off-loading by spin of bankrupt companies, as a regular business practice, came belatedly to public attention and to the attention of the Plaintiffs, by a Wall Street Journal Article which is attached hereto as Exhibit, published long after the fact of the bankruptcy itself.

This was: (1) an <u>intentional</u> concealment by Verizon (with purpose to do harm) of (2) vital and material information, (3) the concealment intended to be relied upon to induce creation of an artificially inflated public market for the stock, and from which (4) widespread, and catastrophic harm, as to the Plaintiffs herein, was foreseeable, and (5) which harm did in fact occur to the Plaintiffs, by their reliance on the market and investment in shares of Idearc, Inc., (6) prior to knowledge of material facts learned only upon the Idearc Chapter 11 Petition filed, March 31, 2009.

(vii). <u>Violation of 18 U.S.C. 157(1) criminal provision against use of Chapter 11 as a "Scheme to Defraud</u>:

1. Idearc, Inc. has at all times occupied a subservient position as both victim of a debt off-loading fraud, AND as loyal publisher of the Verizon (white and yellow page) telephone directories.

2. Always subordinate,Idearc could neither make claim against Verizon for appropriate balance sheet rectification nor fail to carry out the efficient transfer of ownerships to the banks, after the two years intended by the spin agreements.

15

3. Within the Chapter 11 proceeding, this fraud was aggravated by a series of maneuvers, that included:

(A) exclusion of the equity interest (represented by the Plaintiffs and others) from official committee status (B) failure of the Court to mention the presence of an Equity interest in its Confirmation Order, though, at Plaintiffs' sole expense, Plaintiffs attended and participated in all but the final Bench Trial of the matter (because equity had demanded a jury trial), (C) a Creditor Committee that was conflicted by interests of bondholders with "Credit Default Swap" insurance, that favored a finding of bankruptcy, (D) a dominant bondholder (Matlin Patterson) given Committee status, though representing entirely a post-bankruptcy investment, therefore not defrauded, and hardly harmed, and (E) the interest of J.P. Morgan, itself, in respect of an alleged "impaired" portion of the bank debt (thus placing the banking interest on both sides of the bargaining).

4. All of this, together, both constituted fraud, and shielded the fraud from consideration in the proceedings.

5. By reason of these circumstances, the Chapter 11 filing was a "Scheme to Defraud", pursued by Verizon and J.P Morgan, both prior to and within the Bankruptcy Proceeding itself, and THUS a violation of 18 U.S.C. §157(1).

(viii). Conversion of Shares:

1. On or about the first day of the year, 2010, acting on its own, outside of Idearc's then pending Chapter 11 bankruptcy proceeding, Defendant J.P. Morgan and others did (by selling in the public market place, the share ownerships in a recapitalized Idearc) confiscate the existing share ownerships of the Plaintiffs

2. This action occurred at a time when their (the Plaintiffs') F.R.C.P. 60(b)(3)

Motion for Relief from Judgment and accompanying Request for a Stay of the Confirmation Order were placed before the Court and Noticed for Hearing, and before the Court had rendered Judgment on the said Motion.

3. Though the Motion was later denied, it remained subject to the right of appeal to the first level District Court.

4. Defendant J.P. Morgan thereby violated Plaintiffs' private rights under Article III of the U.S. Constitution, by removing these from judicial cognizance.

5. Defendant J.P. Morgan committed the common law intentional tort of "*de bonis asportatis*", as no person may simply "take" another's private right, in this case the right to the unfettered and un-impeded judgment of a court of law.

## III. Jurisdiction and Venue

5. Federal  Question Claims.

The claims hereunder arise under: the United States Constitution, the federal securities' laws, federal income tax laws, and the telecommunications law, and their related regulations, namely: (i) the 5th Amendment to the United States Constitution, (ii) the Security Exchange Act of 1934 and applicable regulations [15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5 and 10b-5-1],    and (iii) the Telecommunications Act  (47 U.S.C. §§206 and 214).

6. State-level claims.

Claims hereunder also arise under the common laws relating  to   fraud, restitution and conversion,  of  which  this  Court  has pendent jurisdiction.

7. This Court has <u>federal question</u> jurisdiction over the federal constitutional

17

and statutory subject matters in this action pursuant to 28 U.SC. §1331 and the Securities Exchange Act (15 U.S.C. §78aa).

8. This Court has <u>diversity of citizenship</u> jurisdiction pursuant to   28 U.S.C §1332, and the amount in controversy exceeds $150,000.

9. <u>Venue</u>:   Venue is convenient and  proper in this District pursuant to the Securities Exchange Act (15 U.S.C. 78aa) and 28 U.S.C. §1391(b) in that Verizon Communications, Inc. is the incumbent telephone carrier within the Eastern District of Pennsylvania, and both Defendants, Verizon and J.P. Morgan, are subject to personal jurisdiction within the District. The J.P Morgan registered Agent within the Eastern District is c/o CT Corp. Systems, 1635 Market St., Philadelphia, PA 19103 and Verizon has many offices in the City of Philadelphia. The forum is convenient as Verizon has major operations within the state, two of the Plaintiffs are residents of the State and their attorneys live and practice within the Eastern District.

## IV.  The Parties

10. <u>The Plaintiffs</u>:

(a) Plaintiff Talbott Barnard  is a natural person residing at 817 Indian Trail Boulevard, Traverse City, Michigan 49686 and is the current owner of  1,550 shares of the common stock of Ideare, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing of its Chapter 11  Petition in Bankruptcy, and prior to any knowledge t of any plans to divest public ownerships.

(b) Plaintiffs Donald B. and Susan Biggerstaff, are natural persons residing at 104 River Ridge Drive, Morganton, N.C. 28655 and were owners of 787,500 shares of the common stock of the former Idearc, Inc., as of the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet or of any preexisting plans to divest the public ownerships. The Plaintiffs Biggerstaff were forced to sell certain of the said shares following the Bankruptcy, and suffered great loss on that account.

Special Damages were suffered by the Biggerstaffs in that Donald Biggerstaff, invested heavily, based on Idearc's high cash flow, former payment of a dividend, 30 year agreement with Verizon and short time elapsed since spin-off date. By virtue of the company's deliberate and reckless act of debt acceleration, failure of Verizon to pay its debts, and the J.P Morgan fraudulent taking of their ownerships, they lost their life's savings and at a point in time when Mrs. Biggerstaff faced a life-threatening medical condition requiring extreme medical intervention and surgery estimated to cost almost $1 Million. The stability of Mr. Biggerstaff's job is threatened, and should it be lost, Mrs. Biggerstaff would lose needed insurance, and they would likely lose their home. The Biggerstaffs suffered mental anguish from fear that the financial loss of their life savings might preclude the medical care needed to save her life.

(c) Plaintiff David Boon is a natural person residing at 11486 Old Forge Road, Waynesboro, PA 17268 and is the current owner of 250,000. shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet or of any pre-existing plans to divest the public ownership.

(d) Plaintiffs Greg and Deb Boser, natural persons resident at 92 Chudy Street, Three Rivers, Massachusetts  01080 and the current owners of 415,000

19

shares of the common stock of the former Idearc, Inc., all the shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.

(e) Plaintiff Col. Thomas Bovet is a natural person resident at 3/F Flat E, Golden Jubilee House, 397 Lockhart Rd., Wanchai, Hong Kong and is the current owner of 50,000 shares of the common stock of the former Idearc, Inc., all the shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships. Special damages were suffered by Thomas Bovet in that he has had coincidental unrelated losses elsewhere, and in mid-career is threatened with personal bankruptcy.

(f) Plaintiffs Zhengxu He and Ying Fang are natural persons resident at 5220 Belsera Court, Reno, Nevada 89519 and are the current owners of 1,010,000 shares of the common stock of the former Idearc, Inc., all the shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.

(g) Plaintiff Mark Hendrych is a natural person residing in Bethel Park, PA with a mailing address at P.O. Box 75, Bethel Park, PA 15102 and is the current owner of 140,000 shares of the common stock of the former Idearc, Inc., all the shares having been purchased before the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet or of any preexisting plans to divest the public ownerships. Special damages were suffered by Mark Hendrych, in that the

20

catastrophic decline in this large investment, was added to the general market collapse, in combination causing the loss of his life's savings.

(h) Plaintiff Bin Li is a natural person residing at 925 Washington Street, Glenview, Illinois 60025 and is the current owner of Idearc securities which include 139,972 shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of banking plans to divest the public ownerships.

(i) Plaintiff Thomas E. Martin is a natural person residing at 3072 W. Glenn Point Lane, Tucson, Arizona 85745-1002 and is the current owner of 2,884,350 shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.

A catastrophic loss was suffered by Thomas Martin in both his business and in his life, in that, as owner of a business in Tucson that depended entirely on Yellow Page advertising, he invested his entire wealth in this stock, when it became available following the spin. The collapse of this investment has both deprived the business of its working capital (now dependent on borrowed money), and deprived persons who were depending on Tom Martin's philanthropy for their livelihoods. Should the business fail, hard working people will be out of work and some would lose their homes.

(j) Plaintiff Middlebar Monastery is a non-profit charitable organization located at 2503 Del Rio Drive, Stockton, CA 95204, and is the current owner of 81,723 shares of the common stock of the former Idearc, Inc., all the said shares

21

having been purchased prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships. Middlebar Monastary suffered special damages in that this is a charitable institution and had a large part of its charitable funds in this stock.

(k)  Plaintiff Jersy Nietubyc is a natural person resident at 1502 15th Court, Jupiter, Florida, 33477 and is the current owner of 34,500 shares of the common stock of the former Idearc, Inc., all the shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships. Special damages were suffered by Jersey Nietubyc in that having been an employee of Idearc, he was first induced to invest in his own company (by matching contributions), then additionally as a savings plan. Having done so, he suffered the double injury of the closing of his office, and then the cancellation of his shares, whereby he lost his savings for a down payment on a home for his family.

(l)  Plaintiff Katherine Perino is a natural person residing at 2420 Longhorn Trail, Tucson, Arizona, 85745 and is the current owner of 1,500 shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.

(m) Plaintiff Brian D. Spencer is a natural person residing at 1026 S. Maple St., Traverse City, Michigan 49684, and  is the current owner of  86,057 shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter

22

11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.

(n) Plaintiff Stephen S. Spencer is a natural person residing at 555 Quail Ridge Drive, Traverse City, Michigan 49686, and is the current owner of 38,000 shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.

While not potentially bankrupted as are some of the others, the Spencer brothers, from the heartland, are fierce believers in American free enterprise, and in the necessity of an honest market place, believed severely violated in this case.

(o) Plaintiff Charles J. Turk is a natural person residing at 519 S. Main Street, Sycamore, Illinois 60178 and is the current owner of 100,000 shares of the common stock of the former Idearc, Inc., all the said shares having been purchased at a point in time prior to the 3/31/09 filing by Idearc, Inc. of its Chapter 11 Petition in Bankruptcy, and prior to any knowledge that the company lacked a fixed balance sheet, or of any preexisting plans to divest the public ownerships.
- being a total of 6,020,152 shares of Idearc, Inc. for all the Plaintiffs.

11. Defendant Verizon Communications, Inc. (Verizon), with principal offices at 140 West Street, New York, N.Y. 10007, and Pennsylvania Registered Agent at c/o CT Corporation, 116 Pine Street, Suite 320, Harrisburg, PA 17101, is the parent of the regional Bell operating companies for the major cities of Northeastern United States, with numerous offices in Philadelphia, PA, and within the jurisdiction of the U.S. District Court for the Eastern District of Pennsylvania.

12. Defendant J.P. Morgan Chase Bank, N.A. is a banking institution chartered pursuant to the National Bank Act with its principal office at 270 Park

23

Avenue, New York, N.Y., 10017-2070, Philadelphia Office at 1650 Market St., Phila., PA 19103, and with its registered agent in Pennsylvania at c/o CT Corp. System, 116 Pine St., Suite 320, Harrisburg, PA 17101. It is Administrative Agent for Bear Stearns, Inc., and for the Secured Lenders in the Bankruptcy Proceeding *In re Idearc*, U.S. Bankruptcy Court, N. District of Texas (No. 09-31828).

## COUNT I

### Telecommunications Act Damage Claim Against Verizon

13.    Plaintiffs incorporate herein by reference paragraph 4(iv) of this Complaint and all allegations stated in the preceding paragraphs of this Complaint

14. This is a Telecommunications Act (47 U.S.C. §206) suit against Verizon Communications, Inc., for damages sustained by the Plaintiffs in direct consequence of Verizon's misuse of its FCC Certificates of Convenience and Necessity to commit securities fraud on a massive scale and as part of its regular business practice - by: (i) first borrowing unsustainably in the billions of dollars (to buy federal licenses and to build networks) and then (ii) laying off this debt upon three controlled subsidiaries (Hawaii Telecom, Idearc and Fairpoint) that would then be spun into public hands, all with the result that remote purchasers for value of a former telephone business would become the payors of the indebtedness incurred in the nation's build out of new wireless, D.S.L., and fiber-optic (FIOS) telephone systems.

15. While it is Verizon that should have been bankrupted by these vast expenditures (like the bankruptcy of the airlines), instead, they employed their

24

prominence with the public, the regulators and the financial institutions to put the bankruptcies over upon others, and to such unfair extent, that following the spin (in approximate terms), the debt of subordinate Idearc became triple its revenues; while the resulting debt of the irresponsible parent, Verizon, was reduced to only a third of its annual revenues!

16. Following the spin, Idearc continued to act as the subservient agent of Verizon (as publisher of its telephone book), prematurely acting to accelerate its own debt, and then filing for voluntary bankruptcy - as part of the spin-off plans in what became a <u>single collapsed fraudulent transaction:</u> *In re Nat'l Forge Co.* 344 B.R. 340, 347 (W.D. PA 2006).

17. Then cooperating fully with J.P. Morgan, in the ensuing bankruptcy proceeding, over opposition of the Plaintiffs herein, and others, Idearc achieved a total cancellation of the equity and a transfer of ownership to the banks.

18. Upon written requests, 9/18/08 and 10/03/08, made by the undersigned (to both the Idearc CEO and CFO, as well as to Verizon) for balance sheet rectification by Verizon, they all refused to act on that request, and further stated, by letter and in telephone call, that they would not.

19. Having been notified by the undersigned and others, and with full knowledge of an impending Bankruptcy of its recently "spun" subsidiary, Verizon failed to take necessary action to correct the faulty balance sheet which it had itself

created, failed to prevent the bankruptcy, and failed to protect its own telephone directory publishing operations, while still holding the monies for which the indebtedness had been incurred, an act of continuing malice toward the victims of its actions.

20. Verizon's debt off-loading was integral to the build out of the Verizon telephone networks, as it is the way, in major part, that it was paid for, and a federal license may be revoked if employed to commit fraud. See *Cargill v.Hardin* 452 F.2'd 1154 (C.A.3'd 1977); *KWK Radio, Inc. v. FCC* 337 F.2'd 540 (D.C. App. 1964). In *FCC v. Woko* 329 U.S. 223 (1946), an FCC license was denied because of a fraudulent securities transaction.

21. Verison is guilty of misuse (by debt off-loading fraud) of the privileges granted to Verizon under the federal Telecommunications Act, and, on that account, 47 U.S.C.§206 is properly invoked.

22. Verizon's misuse of FCC licensing in this case was a more serious infraction than a radio station's fraudulent game show, or a commodity broker's fraudulent trading scheme, by which federal licensing can be lost.

23. Verizon is guilty of the fraudulent use of federal franchise by concealment of information concerning solvency, necessary to make the statements made in SEC Registration Statements not misleading; the concealment was planned, intended, necessary and material to the creation of a public market for the

26

shares of its spun subsidiaries;  Verizon had fore-knowledge of the falsity, and later admitted to this knowledge, which was material to the spin transaction, therefore a fraud upon the market, and a direct cause of the losses suffered by the Plaintiffs, who acted in reliance upon the information provided and which did not include information concerning pre-existing plans to recapitalize by quick transfer of their newly created ownerships to J.P. Morgan.

24.  Both the 3'd and 5th Circuit cases recognize debt off-loading transactions, followed by quick Chapter 11 Petitions in Bankruptcy, as constituting a "single collapsed fraudulent transaction": *In re Nat'l Forge* 344 B.R. 340, 347 (W.D. PA 2006); *U.S. v. Tabor Realty* 803 F.2'd 1288 (3'd Cir. 1986); and *McAsset Recovery v. The Southern Co.* (N.D. Georgia, No. 1:06-cv-417 (2009).

## COUNT II
Securities Exchange Act §10(b) and Rule 10b-5 Claim vs. Verizon & J.P. Morgan

25.  The Plaintiffs incorporate herein by reference paragraph 4(iv)  of this Complaint and all allegations stated in the preceding paragraphs of this Complaint.

26.  This is a securities fraud case against both Verizon Communications, Inc., and J.P. Morgan Chase Bank, N.A. and its subsidiaries, on behalf of  pre-bankruptcy market purchasers of Idearc, Inc. common stock, for violation of section 10(b) of the Securities Exchange Act of 1934, and applicable regulations [15 U.S.C. §78j(b); 17 CFR §240.10b-5, et seq.].

27

27. Defendants Verizon and J.P. Morgan, jointly and severally, violated the Exchange act by planning, orchestrating and accomplishing the spin, listing and public distribution of the Verizon subsidiary, Idearc, that was defined "insolvent" (under the U.S. Bankruptcy Laws) when issued, and prior to when issued (while still a controlled corporation), and then failing to disclose in applicable registration statements their true intent, which was not to create an investment vehicle suitable for a saver's portfolio, but rather to simply off-load debt, and transfer ownership of debt directly over from Verizon to the banks.

28. Verizon and J.P. Morgan jointly and severally violated the Exchange Act by failing to disclose, or to clearly disclose in connection with the spin transaction, that all (but $2.8 Billion) of the Idearc capital (non-business) indebtedness had been acquired without consideration and at a point in time that Idearc remained a controlled subsidiary.

29. Verizon and J.P. Morgan jointly and severally violated the Exchange Act by affirmatively misrepresenting the solvency of Idearc, by: (i) creating an "illusion" of permanence through rights granted under a 30 exclusive publishing agreement, (ii) by allowing for payment of an initial generous (though unsustainable) dividend, and (iii) by withholding information concerning their affirmative intent to permit a near term recapitalization.

30.   Verizon and J.P Morgan are guilty of  fraudulent concealment of information, concerning solvency, necessary to make the statements made in SEC Registration Statements not misleading; the concealment was planned, intended, necessary and material to the creation of a public market for the shares of Idearc; Verizon and J.P. Morgan had fore-knowledge of the falsity, and  Verizon later admitted to this knowledge, which was material to the spin transaction, and a direct cause of severe financial and other losses suffered by the Plaintiffs, who acted in reliance upon the information provided and which did not include information concerning pre-existing plans to recapitalize - by quick transfer of their newly created ownerships to J.P. Morgan.

31.   Verizon and J.P. Morgan are  guilty of creating a fraud upon the market artificially inflating the market for the shares of Idearc, and whereby Plaintiffs, purchasing the shares, have been severely harmed.

32. Both 3'd and 5th Circuit cases recognize debt-off loading transactions, followed by quick Chapter 11 Petitions in Bankruptcy as constituting a "single collapsed fraudulent transaction": *In re Nat'l Forge* 344 B.R. 340, 347 (W.D. PA 2006); *U.S. v. Tabor Realty*  803 F.2'd 1288 (3'd Cir. 1986) and *McAsset Recovery v. The Southern Co.* [N.D. Georgia, No. 1:06-cv-417 (2009)].

## COUNT III

Security Exchange Act §10(b) and Rule 10b-5-1 Claim vs. Verizon & J.P. Morgan

33.   Plaintiffs incorporate herein by reference paragraph 4(iv) of this Complaint and all allegations stated in the preceding paragraphs of this Complaint.

34   This is a suit against Verizon and J.P. Morgan for jointly causing the registration, listing, public distribution market making, and trading in the shares of the common stock of a company bankrupted (as defined in the Bankruptcy Laws) from inception, and with full intent to permit the recapitalization of the same after a waiting period of only two years - the time necessary to escape federal taxation of the transaction under the Internal Revenue Code §355(e), which intent, admitted in the fine print of a later issued (2007) Verizon Annual Statement, was never publicized until after the creation of a vibrant New York Stock Exchange Market for the stock, being thereby the cause of losses suffered by the Plaintiffs.

35.   Because the information concerning the pre-existing intention to permit such short term recapitalization was never publicized to holders of Idearc securities, prior to the spin or any other time, Verizon and J.P. Morgan are guilty of violation of the rule against trading (in the stock of Idearc) "on the basis of material non-public information about the security" in direct violation of S.E.C. rule 10-b-5 [17 C.F.R. §240.10b-5-1].

30

36.   Verizon and J.P Morgan are guilty of fraudulent concealment of information, concerning solvency, necessary to make the statements made in SEC Registration Statements not misleading; the concealment was planned, intended, necessary and material to the creation of a public market for the shares of Idearc; Verizon and J.P. Morgan had fore-knowledge of the falsity, and Verizon later admitted to this knowledge, which was material to the spin transaction, and a direct cause of severe financial and other losses suffered by the Plaintiffs, who acted in reliance upon the information provided and which did not include information concerning pre-existing plans to recapitalize, and the quick transfer of their newly created ownerships to J.P. Morgan.

37. Verizon and J.P. Morgan are guilty of creating a fraud upon the market, and by which Plaintiffs have been severely harmed.

38.   J.P. Morgan has asserted claims against Verizon on account of the spin transaction, which, by reason of these circumstances, belong to the security holders of Idearc, including the Plaintiffs, herein.

39.   Both 3'd and 5th Circuit cases recognize debt-off loading transactions, followed by quick Chapter 11 Petitions in Bankruptcy as constituting a "single collapsed fraudulent transaction": *In re Nat'l Forge* 344 B.R. 340, 347 (W.D. PA 2006); *U.S. v. Tabor Realty* 803 F.2'd 1288 (3'd Cir. 1986) and *McAsset Recovery v. The Southern Co.* (N.D. Georgia, No. 1:06-cv-417 (2009).

31

## COUNT IV

Common Law Fraud and Undue Influence Claims vs. Verizon & J.P. Morgan

40.   Plaintiffs incorporate herein by reference paragraph 4(iv) of this Complaint and all allegations stated in the preceding paragraphs of this Complaint.

41.   This is an action against Verizon and J.P. Morgan for conspiracy to commit a fraud upon the market place under an "Exchange Agreement" (entered 11/13/06, prior to the public distribution of the stock of Idearc, Inc.) whereby Idearc, still then the controlled subsidiary of Verizon, was forced, by undue influence, to endorse an agreement, between Verizon and J.P. Morgan (and then Bear Stearns) to accept a transfer of a full $7 Billion of Verizon's balance sheet indebtedness, approximately $4.7 Billion of which was without consideration, and to which was later added a full $1.5 Billion in the nature of a simple "taking".

42.   The fraudulent concealment, jointly by Verizon and J.P. Morgan, of information concerning: (i) the lack of consideration for these debt transfers, (ii) the enforced nature of the transfers and (iii) the intention to recapitalize after so short a period as that necessary to escape federal income tax on the gain, together, amounted to a misrepresentation of the solvency of Idearc.

43.   Because (i) the Idearc, Inc. balance sheet was approximately the same at the date of its Chapter 11 filing (3/31/09) as at the date of the spin, two and a half years earlier (11/16/06), (ii) because Idearc's debt assumptions did not arise

out of its casual business (such as in the bankruptcies of the railroads, the airlines and the motor car companies), but were deliberately imposed upon it, at a point in time when it was still a controlled subsidiary of Verizon, and lacked volition, (iii) because this was a debt exchange of Verizon bank debt for Idearc debt solely benefiting Verizon (pursuant to an "Exchange Agreement", dated 11/13/06) and of which the main contracting parties were Verizon and the banks, with Idearc's signature solely as endorsement, (iv) because Idearc's signature was obtained by undue influence, (v) because the intent, by these parties, existed, even then, to permit a near term recapitalization of Idearc to correct a balance sheet that was later referred to (by Idearc CEO, Scott Klein) as "terminally ill", (vi) because such original intent and professional insider assessment were concealed, and were not part of the spin registration statements, (vii) because on the contrary, the apparent valuations of the new stock was enhanced by the payment of an initial generous, but unsustainable dividend, (viii) because all the foregoing amounted to a misrepresentation of solvency, and (ix) because [with full knowledge of the potential for ruination of lives resulting from its actions, in huge stockholder populations, scattered across the United States], Verizon failed to take necessary remedial action [which might have included a small capital infusion, guaranty of the bonds or other measures] - for all these reasons, Verizon Communications, Inc. is guilty of what would have been a crime at common law as serious as that of

falsification of the coin (iv Blackstone, p.156),  and a fraud under leveraged buy-out cases of the modern law: *Moody v. Security Pacific* 971 F.2'd 1056, 1065 (3'd Cir. 1992).

44.  Verizon and J.P Morgan had fore-knowledge of the falsity, and Verizon later admitted to this knowledge, which was material to the spin transaction. Therefore  the  spin transaction  [followed  by  voluntary  debt acceleration and premature Chapter 11 filing while the company still remained cash flow positive] were the consummation of a scheme to fraud, at common law.

45.  Such acts of fraud, perpetrated jointly by Defendants, constituted a fraud upon the market and were the direct cause of the severe financial and other losses suffered by the Plaintiffs, who acted in reliance upon the information provided, and which did not include information concerning pre-existing plans to recapitalize with near term transfer of their newly created ownerships to J.P. Morgan.

46. J.P. Morgan has asserted claims against Verizon on account of the spin transaction, which, by reason of these circumstances, belong to the security holders of Idearc, including the Plaintiffs, herein.

47.  Both 3'd and 5th Circuit cases recognize debt-off loading transactions, followed by quick Chapter 11 Petitions in Bankruptcy as constituting a "single collapsed fraudulent transaction": *In re Nat'l Forge* 344 B.R. 340, 347 (W.D. PA

2006); *U.S. v. Tabor Realty* 803 F.2'd 1288 (3'd Cir. 1986) and *McAsset Recovery v. The Southern Co.* (N.D. Georgia, No. 1:06-cv-417 (2009).

## COUNT V

### Common Law Conversion Claim vs. J.P. Morgan

48. Plaintiffs incorporate herein by reference all the allegations in the previous paragraphs of this Complaint.

49. J. P. Morgan achieved a conversion of the share ownerships of the Plaintiffs  FIRST, by its dominance of recent Chapter 11 Bankruptcy proceedings, and by which dominance the proceedings were made virtually *ex parte*, in that, by claiming its secured interest to be "impaired" to the extent of more than half, it became simultaneously both a secured and an "unsecured" creditor.  As a result of this, the Committee admitted itself to be conflicted and ended by granting to J.P. Morgan as Agent for the lending banks, virtually the whole equity value of the company (85%), all protected by a sweeping exculpation of the lenders.

50. SECOND, following Confirmation of the Debtor's Plan of Reorganization in Chapter 11, while (A) Notice of Appeal and (B) Motions for Relief from Judgment  were  pending and  undecided, Idearc, and J.P. Morgan, acting in concert, simply cancelled the old equity, and issued the new, giving over 85% of it to J.P. Morgan and the banks,  some of which new shares were placed

immediately into public trading on the securities' markets, thereby permanently depriving Plaintiffs of their ownership before completion of the pending judicial process.

51. The actions of J.P. Morgan in this episode: (A) deprived the Plaintiffs of their due process right of appeal, (b) removed their private rights in then pending Motions altogether from judicial cognizance, and (C)  exercised dominion over property of the Plaintiffs,  all without benefit of an authorizing judgment.

52. By reason of such unlawful exercise of dominion over property belonging to the Plaintiffs, J.P. Morgan is guilty of the common law intentional tort of conversion, on account of which it should be held liable to the Plaintiffs and for the full value of the share ownerships of the Plaintiffs thus unlawfully taken and disposed of.

## COUNT VI

### Infringement by Verizon and J.P. Morgan, under Color of Federal Law, of Constitutional Rights Guaranteed by the 5th Amendment

53.  Plaintiffs incorporate herein by reference paragraph 4(iv) of this Complaint and all  allegations stated in the previous paragraphs of this Complaint.

54. Verizon, the federally (Federal Communications Commission) licensed incumbent wire-line telephone carrier for Northeastern United States,  did utilize its resulting monopoly power, instant name recognition, federal licensing and resulting color of federal law, to build out its great new wireless, DSL, FIOS and

36

other systems, and did then pay for the same, through aid and assistance of J. P. Morgan, by a plan of debt off-loading through spun subsidiaries, of which Idearc was only one of three, all ending in short term Chapter 11 Bankruptcies. These proceedings have taken, or will take, without compensation, the property rights, including in some cases the life savings, of bone fide purchasers for value of the securities, both stock and bond, of the spun subsidiaries, including that of the Plaintiffs herein, who purchased in reliance upon the traditionally safe quality of a "telephone" related, and federally licensed, company.

55. The said debt off-loading spin transactions were necessary, integral and inseparable from the federal licensing and authority granted pursuant to the Federal Telecommunications Act [47 U.S.C. §214] for building of Verizon's new and expanded systems in the Northeastern United States and elsewhere, as without the ridding of the debt, the building could not have occurred.

56. The debt off-loading spin transactions were accomplished for the purpose of achieving the national and U.S. Federal Communications Commission policy to build and acquire a same technologically advanced communication system for the United States as existed or would soon exist in European and Asian countries. The payment of the costs thereof, including Verizon's methodology for payment of the costs, were one and the same with the policy itself, well known to the F.C.C., therefore part of national policy and done <u>under color of federal law</u>.

37

57   In order to not only achieve the debt relief (by a spin transaction), but also to do so without taxation – as in a tax free exchange - authorized by 26 U.S.C §355(e) – Verizon obtained an Internal Revenue Service "Tax Letter" of permission to pursue the debt off-loading spin, tax free, so long as there was no change of ownership (meaning 50% ownership) of the spun subsidiary within the two year period following the spin.

58.   Idearc, as continuing agent for Verizon, violated the IRS tax free exchange letter by commencing "substantial negotiations" toward recapitalization on, or about October, 2008 (before the end of the two years), and, with J.P. Morgan, it made the United States government co-party to a fraud, by then filing an actual Chapter 11 Petition in Bankruptcy, whereby ownership is transferred to J. P. Morgan, only 2 years and four months after the spin (on 3/31/09).

59.   The Idearc Chapter 11 Petition in Bankruptcy filed 3/31/09, and the resulting cancellation of the share ownerships of the Plaintiffs were done under "color of federal law", in that the authority of an agency of the federal government (the IRS) had now been utilized to justify  a transaction  constituting a common law fraud - whatever the lapse of time occurring in the separated events.

60. The debt off-loading as well as the tax avoidance transactions, relating to the spin, were fraudulent in respect of innocent purchasers of the securities of Idearc. These transactions have caused severe financial losses to the Plaintiffs,

38

herein, who purchased shares in Idearc in reliance upon the legitimacy of Verizon's federally licensed activities, and without knowledge of the misuse of licensing authority, nor of the said tax avoidance motivations, and they have thereby been deprived, by persons, Verizon and J.P. Morgan, acting under "color of federal law", of their property without due process of law, in violation of the 5th Amendment to the United States Constitution, and on account of which a right of action exists against the said Defendants, Verizon and J.P. Morgan, under legal doctrines recognized in the 3'd Circuit. See *Susquehanna Valley Alliance v.Three Mile Island* 619 F.2'd 231 (3'd Cir. 1980).

61. Both 3'd and 5th Circuit cases recognize debt-off loading transactions, followed by quick Chapter 11 Petitions in Bankruptcy as constituting a "single collapsed fraudulent transaction": *In re Nat'l Forge* 344 B.R. 340, 347 (W.D. PA 2006); *U.S. v. Tabor Realty* 803 F.2'd 1288 (3'd Cir. 1986) and *McAsset Recovery v. The Southern Co.* (N.D. Georgia, No. 1:06-cv-417 (2009)

## COUNT VII

Shareholder Direct Right of Action against Defendant Verizon Communications, Inc. as Established by Final Decree of the U.S. Bankruptcy Court, Northern District of Texas in Case 09-31828

(In re Idearc, Inc.)

62. Plaintiffs incorporate herein by reference all the allegations stated in the previous paragraphs of this Complaint.

63. By final Confirmation Order (dated 12/22/09) of the U.S. Bankruptcy Court for the Northern District of Texas, in *In re Idearc* (09-31828), a right of action was created, recognized, allowed and assigned to a Litigation Trust for the benefit of the creditors of the Bankrupt Idearc, and against Verizon, on account of alleged fraud in the spin transactions (the same as referred to in this Complaint), and which was the direct operative and proximate cause of the bankruptcy condition, subject of the bankruptcy proceeding.

64. The same rights of action which are the subject of the said "Litigation Trust" (in favor of the named beneficiaries of the trust) exist, as well, in favor of all the security holders of Idearc, Inc., including the equity, since no basis exists for their exclusion.

65. By final order and decree of the said U.S. Bankruptcy Court in *In re Idearc* (supra), the said rights of action (especially actions based on fraud) are specifically preserved, and defendant parties, herein, are not exonerated in any case based on allegation of fraud. By order of the said Bankruptcy Court these are direct (non-derivative) rights which security holders (including equity security holders) have against Verizon and J.P. Morgan, since if it were otherwise, there would have been no purpose to the provisions (in the U.S. Bankruptcy Court Confirmation Order) concerning limitation on exoneration.

66.    Verizon Communications, Inc., by its attorney, made appearance and filed objections in the said Bankruptcy proceeding, but made no objection to the Plan provisions concerning suit against Verizon. And Verizon failed to appeal the final Order of Confirmation of the Plan.

67.    The Confirmation Order in the said Bankruptcy Proceeding (as entered 12/22/09) is, therefore, a final adjudication and *res adjudicata* in respect to the issue of the existence of a direct right of action by the Plaintiffs herein against Verizon.

68.    Plaintiffs hereby repeat and reallege Counts II, III  and IV against Verizon, as direct rights of action granted by Order and Decree of the U.S. Bankruptcy Court of the Northern District of Texas in *In re Idearc*, Case No. 09-31828.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court:

1. To find as a matter of law that:

A.  Duty of recipient of pass-through loans charged to a person controlled by the recipient.

(i).  The direct payment (credit or pass through) of bank borrowings from J.P. Morgan, Bear Stearns, Inc. and others to Verizon, instead of to Idearc, Inc., imposed a duty upon Verizon to indemnify remote purchasers for value of the

41

securities of Idearc from any and all losses and/or damages suffered by reason of any near term resulting bankruptcy of Idearc, otherwise the transactions will have become a fraud upon the market.

B.   Duties and Disabilities of Lenders who make pass-through loans causing bankruptcy.

(ii).   It is a fraudulent transaction for a lender to loan large sums to one person and charge another person with the repayment obligation, if the transaction results in a balance sheet bankruptcy of the person charged, or if a bankruptcy filing actually occurs within a period of five years from the date of the loan.

(iii). It is a fraudulent transaction to lend large sums to one, and to enforce collection against another, who is a non-recipient, while simultaneously exonerating the actual recipient of the loans.

(iv). Creditor Banks that, with full knowledge and intent, make "pass-through" loans to one person for the benefit of another may not enforce collection thereof against the intermediate payee if and to the extent the monies are to be collected from the ownership rights of innocent security holders in a bankruptcy proceeding, and if any such collection should occur, the collecting banks shall indemnify such security holders for any and all losses suffered on account thereof.

(v).   It is a fraudulent transaction for the same person to be both the cause of a bankruptcy arising out of pass-through loans and the claimant to the proceeds of an

ensuing bankruptcy proceeding, that results within a period of five years from the date of the loan.  The claims of any such person shall be deemed subordinated to the rights of the public security holders of the bankrupted company.

C.  Law of the Case.

(vi).    It was an undisputed fact in the Idearc Bankruptcy proceeding that no intervening event occurred in the two years between the date of the spin transaction in this case   (11/16/06) and the Petition in Bankruptcy (3/31/09), whereby the equity values of the spun subsidiary (Idearc, Inc.) were collapsed from the starting spin value of $5 Billion [as obtained by Verizon stockholders and insiders following the spin transaction], to the Bankruptcy valuation of $260 Million [as basis for settling claims of creditor banks],   which latter figure was therefore the consummation of a fraud by Verizon interests upon the public security holders of Idearc, Inc.

(vii).    It is: (1) the law of the case in the Idearc Bankruptcy proceeding [*In re Idearc, Inc.,* U.S. District Court of the Northern District of Texas, 09-31828],  by its creation of a "Litigation Trust" to pursue claims against Verizon, and,   (2)  a decided issue [in the case of *McAsset Recovery, LLC v. The Southern Co.*  U.S. District Court for the Northern District of Georgia, Civ. Action No. 1:06-CV- 417 (2009)] that: a debt off-loading spin transaction raises a judiciable issue (not subject to dismissal) in a suit by security holders against the spinning parent for

securities and common law fraud,  and that such case is subject to the right of jury trial.

AND THEREFORE:

2. To give judgment for the Plaintiffs on each and every Count of this Complaint.

3. To award Damages to the Plaintiffs on account of losses suffered by reason of the Bankruptcy of Idearc in amounts exceeding $150,000, including punitive damages by reason of the intentionally caused bankruptcy of Idearc, Inc., followed by acts of abandonment, and malicious enforcement of bankruptcy rules, of and against the innocent.

4. To award attorney fees, expert witness fees and the costs of this action as specifically allowed by 47 U.S.C.§206, and

5. To grant (i) a jury trial of factual issues raised by this Complaint, and (ii) such other and further relief as may be lawfully requested.

Respectfully submitted and verified, this 14th day of April, 2010.

By: /s/ *Peter Talbot*

**Peter Talbot, PA Atty. Lic. No. 13974**
**554 Rosemary Circle**
**Media, PA 19063**
**(610) 566-3315**
Attorney for the Plaintiffs

Attachments: 1.Wall Street Journal Article, Reporter Dennis Berman, 8/11/09
        2. Verizon 2007 Annual Statement, p. 48 - admitting original  intent to permit the recapitalization of Idearc at any time,  or that Idearc had no fixed capital structure.
        3. Tax Sharing Agreement, pp 17-18, showing tax avoidance plans.
        4.. Gazette-Mail.com 3/24/10 Report re Congressional Bill to Repeal Tax Loophole

44

## VERIFICATION

The undersigned, Peter Talbot, attorney for the Plaintiff, hereby certifies that he has read the within Complaint, and that, based upon personal knowledge, information and belief, formed after reasonable inquiry and study of the Bankruptcy Proceedings of Idearc, Inc., the allegations stated in the Complaint are well grounded in fact, and warranted to be stated by existing law, nor are they stated for any improper purpose to harass or to cause unnecessary delay, nor to increase the cost of litigation, but on the contrary, the parties' Defendants were notified in writing, of the issues complained of, both well in advance, and immediately prior to, the institution of this action, with full opportunity granted for other resolution.

Signed and verified this   14th   day of April, 2010

By: /s/ *Peter Talbot*
    **Peter Talbot, PA Atty. Lic. No. 13974**
    **554 Rosemary Circle**
    **Media, PA 19063**
    **(610) 566-3315**
    Attorney for the Plaintiffs

CERTIFICATE OF SERVICE

I, Peter Talbot, Esq., attorney for the Plaintiffs do hereby certify that I have this 14th day of April, 2010 served a true and correct copy of the within SECOND AMENDED COMPLAINT upon the following persons by U.S. Certified Mail, return receipt requested, and that the amendments contained herein involve the rewording of the allegations of the several Counts, and an amendment in the number of shares held by one of the Plaintiffs.

Verizon Communications, Inc
C/O Ivan Seidenberg, Chairman & CEO
140 West Street
New York, N.Y. 10007

J.P. Morgan Chase Bank, N.A.
C/O Jamie Dimon, Charman & CEO
270 Park Avenue
New York, N.Y. 10017-2070

William J. Clemens, Esq.
Klehr Harrison Harvey Branzberg LLP
1835 Market St.
Philadelphia, PA 19103

Signed this 14th day of April, 2010

By : /s/ *Peter Talbot*

**Peter Talbot, PA Atty. Lic. No. 13974**
554 Rosemary Circle
Media, PA 19063
(610) 566-3315
*Attorney for the Plaintiffs*

E X H I B I T

THE WALL STREET JOURNAL.

Tuesday, August 11, 2009   C1

# The Two Sides of Verizon's Deal Making



HERO OR VILLAIN? Verizon CEO Ivan Seidenberg at a 2008 conference.

**Verizon Communications**

Inc. boss Ivan Seidenberg may be one of the best deal makers of his time, or one of the worst.

Today, three of Verizon's most significant divestitures are either in bankruptcy or near it. As they say on Wall Street, it all depends on what side of the trade you're on.

Verizon's former yellow-pages unit, which goes by the ungainly name of Idearc, sought court refuge from creditors in May; Verizon's former Hawaiian telecom franchise, purchased by Carlyle Group, filed for bankruptcy in December, and Fair-Point Communications, which absorbed landlines from Verizon in a complicated divestment, is close to going under, the company said in a July securities filing. In all, these companies have lost upward of $13 billion in value and counting.



**THE GAME**
By Dennis K. Berman

This should make Mr. Seidenberg a hero to Verizon investors. Not only did he bail out of the assets at the right moment, he extracted prices that literally sucked the life out of the buyers.

If only it were that simple. In the case of Idearc and Fair-Point, their buyers happened to include Verizon shareholders themselves. They received controlling interests in the newly formed companies.

That is a good thing for those who sold out early. Those who didn't are now sitting on Idearc and FairPoint stock trading at three cents and 54 cents a share, down from around $28 and $10, respectively, when the spinoffs began.

How did Idearc go from birth to bankruptcy in under 900 days? Back in 2006, private-equity firms were scrambling to buy directories companies, reasoning that their steady cash flows could support very high levels of debt.

Verizon's tax-free spinoff was in essence a do-it-yourself leveraged buyout, with the company's own shareholders the buyers of a highly indebted company, eagerly financed by banks and high-yield bond buyers. Verizon was taking what the market gave it.

It took too much. The incursions of Internet advertising and the decaying U.S. economy soon overwhelmed Idearc, whose revenue fell nearly 9% over the past year. Once worth $5 billion in equity and $9.2 billion in debt, its bankruptcy advisers now peg its value at around $3 billion.

"It was a victim of a time when people's perception of risk and reward were shaped by the environment," said one person who worked on the original transaction.

Verizon officials say they are proud of their deals. "These asset sales made sense for the acquiring companies at the time they were bought and have proven to add significant value for Verizon shareholders since then," said Verizon spokesman Peter Thonis.

There are nonetheless consequences for a deal-making machine like Verizon—with at least 18 transactions in the past seven years—to leave a string of busted companies in its wake.

These things matter greatly to how state and federal regulators perceive the company. Maine, New Hampshire, Vermont and Hawaii each are in an uproar over the FairPoint divestiture, with much of the ire directed at Verizon. "It was a great deal for Verizon," said New Hampshire's public consumer advocate, Meredith Hatfield. "Whether it was a great deal for New Hampshire consumers is a different question.

It matters to market perceptions, too. "Could you be the next FairPoint?" barked CNBC Jim Cramer in an interview with the chief executive of **Frontier Communications** Inc., which bought five million rural landlines from Verizon in May.

But perhaps being a good deal maker means not worrying about the past. Mr. Seidenberg is today focused on Verizon's fiber-optic service FiOS, which was funded in part by the three divestitures. He hasn't uttered the word "Idearc" in public in two and a half years.

*Email: dennis.berman@wsj.com*

## Legacy Assets

Verizon shares vs. the performance of two Verizon spinoffs, FairPoint Communications and Idearc.



Source: WSJ Market Data Group



## Notes to Consolidated Financial Statements continued

### NOTE 2

#### DISCONTINUED OPERATIONS, EXTRAORDINARY ITEM AND OTHER DISPOSITIONS

#### Discontinued Operations

*Telecomunicaciones de Puerto Rico, Inc.*
On March 30, 2007, we completed the sale of our 52% interest in Telecomunicaciones de Puerto Rico, Inc. (TELPRI) and received gross proceeds of approximately $980 million. The sale resulted in a pretax gain of $120 million ($70 million after-tax). Verizon contributed $100 million ($65 million after-tax) of the proceeds to the Verizon Foundation.

*Verizon Dominicana C. por A.*
On December 1, 2006, we closed the sale of Verizon Dominicana C. por A (Verizon Dominicana). The transaction resulted in net pretax cash proceeds of $2,042 million, net of a purchase price adjustment of $373 million. The U.S. taxes that became payable and were recognized at the time the transaction closed exceeded the $30 million pretax gain on the sale resulting in an overall after-tax loss of $541 million.

*Verizon Information Services*
In October, 2006, we announced our intention to spin-off our domestic print and Internet yellow pages directories publishing operations, which have been organized into a newly formed company known as Idearc Inc. On October 18, 2006, the Verizon Board of Directors declared a dividend consisting of 1 share of the newly formed company for each 20 shares of Verizon owned. In making its determination to effect the spin-off, Verizon's Board of Directors considered, among other things, that the spin-off may allow each company to separately focus on its core business, which may facilitate the potential expansion and growth of Verizon and the newly formed company, and allow each company to determine its own capital structure.

On November 17, 2006, we completed the spin-off of our domestic print and Internet yellow pages directories business. Cash was paid for fractional shares. The distribution of common stock of the newly formed company to our shareowners was considered a tax free transaction for us and for our shareowners, except for the cash payments for fractional shares which were generally taxable.

At the time of the spin-off, the exercise price and number of shares of Verizon common stock underlying options to purchase shares of Verizon common stock, restricted stock units (RSU's) and performance stock units (PSU's) were adjusted pursuant to the terms of the applicable Verizon equity incentive plans, taking into account the change in the value of Verizon common stock as a result of the spin-off.

In connection with the spin-off, Verizon received approximately $2 billion in cash from the proceeds of loans under a term loan facility of the newly formed company and transferred to the newly formed company debt obligations in the aggregate principal amount of approximately $7.1 billion thereby reducing Verizon's outstanding debt at that time. We incurred pretax charges of approximately $117 million ($101 million after-tax), including debt retirement costs, costs associated with accumulated vested benefits of employees of the newly formed company, investment banking fees and other transaction costs related to the spin-off, which are included in discontinued operations.

In accordance with SFAS No. 144 we have classified TELPRI, Verizon Dominicana and our former domestic print and Internet yellow page directories publishing operations as discontinued operations in the consolidated financial statements for all periods presented through the date of the spin-off or divestiture.

The assets and liabilities of TELPRI are disclosed as current assets held for sale and current liabilities related to assets held for sale in the consolidated balance sheet as of December 31, 2006. Additional details related to those assets and liabilities were as follows:

| At December 31, | (dollars in millions) 2006 |
|---|---|
| Current assets | $ 303 |
| Plant, property and equipment, net | 1,436 |
| Other non-current assets | 853 |
| Total assets | $ 2,592 |
| | |
| Current liabilities | $ 181 |
| Long-term debt | 575 |
| Other non-current liabilities | 1,398 |
| Total liabilities | $ 2,154 |

Related to the assets and liabilities above was $241 million included as Accumulated Other Comprehensive Loss in the consolidated balance sheet as of December 31, 2006.

Income from discontinued operations, net of tax, presented in the consolidated statements of income included the following:

| Year Ended December 31, | (dollars in millions) 2007 | 2006 | 2005 |
|---|---|---|---|
| Operating revenues | $ 306 | $ 5,077 | $ 5,595 |
| | | | |
| Income before provision for income taxes | $ 185 | $ 2,041 | $ 2,159 |
| Provision for income taxes | (43) | (1,282) | (789) |
| Income from discontinued operations, net of tax | $ 142 | $ 759 | $ 1,370 |

#### Extraordinary Item

*Compañia Anónima Nacional Teléfonos de Venezuela (CANTV)*
In January 2007, the Bolivarian Republic of Venezuela (the Republic) declared its intent to nationalize certain companies, including CANTV. On February 12, 2007, we entered into a Memorandum of Understanding (MOU) with the Republic, which provided that the Republic offer to purchase all of the equity securities of CANTV, including our 28.5% interest, through public tender offers in Venezuela and the United States. Under the terms of the MOU, the prices in the tender offers would be adjusted downward to reflect any dividends declared and paid subsequent to February 12, 2007. During the second quarter of 2007, the tender offers were completed and Verizon received an aggregate amount of approximately $572 million, which included $476 million from the tender offers as well as $96 million of dividends declared and paid subsequent to the MOU. Based upon our investment balance in CANTV, we recorded an extraordinary loss of $131 million, including taxes of $38 million.

#### Other Dispositions

*Telephone Access Lines Spin-Off*
On January 16, 2007, we announced a definitive agreement with FairPoint Communications, Inc. (FairPoint) that will result in Verizon establishing a separate entity for its local exchange and related business assets in Maine, New Hampshire and Vermont, spinning off that new entity into a newly formed company, known as Northern New England Spinco Inc. (Spinco), to Verizon's shareowners, and immediately merging it with and into FairPoint. These local exchange and business assets are included in Verizon's continuing operations. It is anticipated that as long as a conditions are satisfied and assuming completion of the related financing transactions, both the spin-off of Spinco to Verizon shareowners and the merger of Spinco with FairPoint will occur on March 31, 2008. Verizon



Case 2:10-cv-01304-GP   Document 19   Filed 05/03/10   Page 50 of 52

(d) Except as set forth in this Agreement and in consideration of the mutual indemnities and other obligations of this Agreement, any and all prior Tax sharing or allocation agreements or practices between any member of the Verizon Group and any member of the Spinco Group shall be terminated with respect to the Spinco Group as of the Distribution Date, and no member of the Spinco Group shall have any continuing rights or obligations thereunder.

2.04 AMENDED RETURNS. Spinco shall not, and shall not permit any member of the Spinco Group to, file any amended Tax Return that includes any member of the Verizon Group.

ARTICLE III.

REPRESENTATIONS AND COVENANTS

3.01 COMPLIANCE WITH THE RULING AND TAX OPINION.

(a) Verizon (on behalf of itself and all other members of the Verizon Group) hereby represents and warrants that (i) it has examined (A) the Ruling, (B) the Tax Opinion, (C) the Ruling Request, (D) the Tax Certificates and (E) any other materials delivered or deliverable in connection with the issuance of the Ruling and the rendering of the Tax Opinion (collectively, the "Tax Materials") and (ii) the facts presented and representations made therein, to the extent descriptive of or otherwise relating to Verizon or any member of the Verizon Group, are or will be from the time presented or made through and including the Distribution Date true, correct and complete in all material respects. Verizon (on behalf of itself and all other members of the Verizon Group) hereby confirms and agrees to comply with any and all covenants and agreements in the Tax Material applicable to Verizon or any member of the Verizon Group.

(b) Spinco (on behalf of itself and all other members of the Spinco Group) hereby represents and warrants that (i) it has examined the Tax Materials and (ii) the facts presented and representations made therein, to the extent descriptive of or otherwise relating to Spinco or any member of the Spinco Group, are or will be from the time presented or made through and including the Distribution Date true, correct and complete in all material respects. Spinco (on behalf of itself and all other members of the Spinco Group) hereby confirms and agrees to comply with any and all covenants and agreements in the Tax Material applicable to Spinco or any member of the Spinco Group.

3.02 OPINION REQUIREMENT FOR MAJOR TRANSACTIONS. Spinco (on behalf of itself and all other members of the Spinco Group) hereby confirms and agrees that no member of the Spinco Group will take or permit to be taken within 2 years of the Distribution the following actions: (i) the issuance of any Spinco equity or rights to acquire any Spinco equity (other than any such issuance qualifying under a Treas. Reg. § 1.355-7(d) "safe harbor" such as an issuance in connection with the performance of services within the meaning of Treas. Reg. 1.355-7(d)(8)); (ii) redemptions or repurchases of any Spinco equity (except to the extent consistent with the requirements of Rev. Proc. 96-30), (iii) recapitalizations or other dispositions of, or modifications to the terms of, any Spinco equity; (iv) any liquidation, merger or consolidation involving Spinco, VIS or Directories (including, for purposes of clarification, the conversion of Spinco or Directories into a limited liability company or the conversion of VIS

7



into a corporation); (v) any sale of all or substantially all of Spinco's assets in a single transaction or series of related transactions; (vi) the disposition or discontinuance of the operation of any active trade or business assets except in the ordinary course of business; (vii) entering into any negotiations, agreements or arrangements that may cause the Distribution to be treated as part of a plan or series of related transactions pursuant to which one or more persons acquire directly or indirectly stock of Spinco representing a "50-percent or greater interest" therein within the meaning of Section 355(d)(4) of the Code; or (viii) the taking of actions or positions inconsistent with any representation or covenant of Spinco or any member of the Spinco Group contained in Section 3.01(b) or Section 6.02 of this Agreement (collectively, the "Prohibited Acts"). Notwithstanding the foregoing, Spinco or a member of the Spinco Group may take any of the Prohibited Acts, subject to, and without limiting or modifying, Spinco's continuing indemnification obligation under Section 4.01(b), if Spinco obtains (x) the written consent of Verizon (which consent may be given or withheld in Verizon's sole discretion) or (y) a supplemental ruling from the Internal Revenue Service or an opinion of a nationally recognized law firm, in form and substance reasonably satisfactory to Verizon, that the taking of such action will not adversely affect, directly or indirectly, any of the conclusions contained in the Ruling or the Tax Opinion.

3.03 ADDITIONAL SPINCO COVENANTS. Notwithstanding anything else to the contrary contained in this Agreement or any other agreement, Spinco (on behalf of itself and all other members of the Spinco Group) hereby confirms and agrees that (i) neither Spinco nor any member of the Spinco Group will, directly or indirectly, pre-pay, pay down, redeem, retire or otherwise acquire, however effected, any of the Senior Notes or the Tranche B Term Loan prior to its stated maturity, (ii) neither Spinco nor any member of the Spinco Group will take or permit to be taken any action at any time, including, without limitation, any modification to the terms of any of the Senior Notes or the Tranche B Term Loan, that could jeopardize, directly or indirectly, the qualification, in whole or in part, of any of the Senior Notes or the Tranche B Term Loan as "securities" within the meaning of Section 361(a) of the Code, (iii) no issuance of stock by Spinco, any member of the Spinco Group, or any Affiliates thereof and no change in the stock ownership of any such entities will occur that could cause Section 355(d) or Section 355(e) of the Code to apply to the Distribution, and (iv) neither Spinco nor any member of the Spinco Group will take or permit to be taken any action at any time that could jeopardize, directly or indirectly, any of the conclusions contained in the Ruling or the Tax Opinion. Notwithstanding the foregoing, Spinco or a member of the Spinco Group may take or permit to be taken any of the actions described in this Section 3.03, subject to, and without limiting or modifying, Spinco's continuing indemnification obligation under Section 4.01(b), if (x) failure to take such action would violate the Credit Agreement, the Indenture or any of the documents entered into in connection therewith (each as executed as of the Distribution Date), (y) Spinco obtains the written consent of Verizon (which consent may be given or withheld in Verizon's sole discretion) or (z) Spinco obtains a supplemental ruling from the Internal Revenue Service or an opinion of a nationally recognized law firm, in form and substance reasonably satisfactory to Verizon, that the taking of such action will not adversely affect, directly or indirectly, any of the conclusions contained in the Ruling or the Tax Opinion.

3.04 VERIZON COVENANTS. Notwithstanding anything else to the contrary contained in this Agreement or any other agreement, Verizon (on behalf of itself and all other members of the Verizon Group) hereby confirms and agrees that neither Verizon nor any

8



Jobs bill provision may pose hurdle for Verizon-Frontier landline deal ...

Case 2:10-cv-01304-GP   Document 19   Filed 05/03/10   Page 52 of 52

# Saturday Gazette-Mail @ wvgazette.com

March 24, 2010

## Jobs bill provision may pose hurdle for Verizon-Frontier landline deal

By Eric Eyre
Staff writer

CHARLESTON, W.Va. -- A provision in a federal jobs bill that outlaws a tax loophole used in Verizon's bid to sell its telephone landlines to Frontier Communications Corp. in West Virginia and 13 other states could derail the sale.

On Wednesday, the U.S. House passed legislation that includes a ban on a tax shelter -- known as a Reverse Morris Trust -- that Verizon and other companies have used to spin off operations tax-free. Verizon plans to use the Reverse Morris Trust as part of its $8.6 billion deal with Frontier.

The Communications Workers of America said the elimination of the tax-free provision, which now goes to the U.S. Senate, could be the "death-knell" for Verizon's plans to sell 617,000 wire lines in West Virginia to Frontier.

"The Reverse Morris Trust was designed by Wall Street for Wall Street, not West Virginians," said Ron Collins, a union vice president. "We're happy Congress shares our view that the Reverse Morris Trust is a tax break for corporations, not a job-creating tool. Without this tax loophole, I don't believe Verizon would be so eager to sell to Frontier."

Verizon and Frontier have said many companies have used the tax-free provision, which has been legal since 1997.

Verizon spokeswoman Christy Reap declined comment Wedesday. A Frontier spokesman couldn't be reached for comment.

Verizon has used the Reverse Morris Trust to unload wire lines in three other states. Two of the three companies that took over the phone lines have since declared bankruptcy.

Verizon and Frontier have said the same problems won't happen in West Virginia because Frontier already has successful customer support, billing and operating systems in place.

Stamford, Conn.-based Frontier has 144,000 residential and small business telephone access lines in West Virginia.

The state Public Service Commission is reviewing the sale and expects to decide whether to approve or reject the deal by May.

"The House has recognized the Reverse Morris Trust as a greedy grab by corporations to avoid paying their fare share of taxes," said Elaine Harris, spokeswoman for the Communications Workers of America. "We pay our taxes. Why shouldn't Verizon have to pay one cent on an $8 billion deal?"

The union, which has lobbied House and Senate members to support the jobs bill and eliminate the Reverse Morris Trust, estimates that Verizon would avoid paying $600 million in taxes under the existing proposed tax-free deal.

@tag:Reach Eric Eyre at erice...@wvgazette.com or 304-348-4869.



3/27/2010 11:34